# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Carrie Johnson,

       Plaintiff,

                                          **Case No.: 2:08-cv-515**

-v-                                              **JUDGE SMITH**

                                          **Magistrate Judge Abel**

The Washington County Career Center,

       Defendant.

### OPINION AND ORDER

Plaintiff Carrie Johnson brings this action against Defendant The Washington County Career Center ("WCCC"), alleging that Defendant WCCC unlawfully discriminated against her by dismissing her from the Surgical Technologist Program in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131 *et seq.* and Ohio's disability discrimination law, Ohio Revised Code Section 4112.01. This matter is before the Court on Defendant WCCC's Motion for Summary Judgment (Doc. 18). Plaintiff has responded and this matter is ripe for review. For the reasons that follow, the Court **GRANTS** Defendant's Motion for Summary Judgment.

## I.    BACKGROUND

Plaintiff Carrie Johnson is an individual citizen of the State of Ohio. Plaintiff has a learning disability involving reading and comprehension, and is substantially limited in the major life activity of learning. (Pl. Aff. ¶ 2).

Defendant Washington County Career Center ("WCCC") offered a one year Surgical Technologist Program (the "Program"), running January through December 2008. The winter quarter began on January 7, 2008 and ended on March 27, 2008. The only requirement for enrollment in the Program was a high school diploma or a general education degree. On February 26, 2008, Connie Bennett, the Medical Programs Director for WCCC, interviewed Plaintiff to assist her in her enrollment in the 2008 Program, which had already begun. During the initial conversation, Plaintiff and Ms. Bennett discussed Plaintiff's disability at length, as well as the type of accommodation she would need. Before Plaintiff enrolled in the Program, she wanted to be sure Defendant would provide her with an accommodation. Ms. Bennett and Alicia Becker, the Financial Aid Advisor, assured Plaintiff that she would receive an accommodation, as the law required Defendant to accommodate her. (Pl. Aff. ¶¶ 2-3; Bennett Aff. ¶¶ 10-14; Poling Dep. at 36-38).

On February 27, 2008, Ms. Bennett emailed Mr. Poling, Director of Adult Education, and advocated that Plaintiff be admitted to the Program, despite her late enrollment, because she had an Associate's Degree in General Science from Washington State Community College ("WSCC") and attended Marietta College for eighteen months. (Bennett Aff. ¶14, Ex. B; Poling Dep. at 37-38). Ms. Bennett also recommended Plaintiff because she knew that many classes in the winter quarter had been canceled because of inclement weather and instructors failing to show for class. (Bennett Aff. ¶¶ 10, 11, 14). As a result of the no-shows by the instructors, Ms. Bennett taught many of the classes during the winter quarter. As such, she knew that only basic information had been covered, which Plaintiff had knowledge of because of her science degree. (*Id*. ¶ 11). Based on Ms. Bennett's recommendation, Mr. Poling authorized Plaintiff's admittance

2

to the Program. (Bennett Aff. ¶ 16, Ex. B). Plaintiff completed the application for the Program and paid the tuition. (*Id*. ¶ 16, Ex. B).

On February 27, 2008, after registering for classes, Plaintiff informed Michele Grosklos, Adult Technical Training Office Assistant; Debbie Cline, Office Assistant; and Barbara Wolfe, Adult Technical Directors Assistant, that she had a disability and would require an accommodation. Specifically, Plaintiff asked that her textbooks be made available in audio format or that a Kurzweil Reader be provided. Plaintiff also asked Ms. Cline and Mrs. Wolfe how Defendant accommodated for test taking and whether there was a disability coordinator for students. Plaintiff Johnson describes that the staff did not know the disability guidelines, and they recommended that she discuss her accommodation with her teachers. Later that evening, on Plaintiff's first night of class, Liz Pickrell, a night supervisor, delivered to Plaintiff a post-it note stating that she needed to provide proof of her degree and disability. (Pl. Aff. ¶¶ 4-6).

On February 28, 2008, Plaintiff faxed Defendant a copy of her Associate's Degree as proof of her degree and a letter from Barbara Wilson, Plaintiff's Rehabilitation Services Commission case worker, as record of her disability. (Pl. Aff. ¶ 7, Ex. A). Neither Mr. Poling nor Ms. Bennett requested any further proof of Plaintiff's college education after she provided Defendant with a copy of her Associate's Degree. In fact, Ms. Bennett assured Plaintiff that the documentation that she provided was sufficient.

On March 3, 2008, Mr. Poling approached Ms. Bennett about Plaintiff's request for an accommodation. (Bennett Aff. ¶ 17). After the discussion, Ms. Bennett transcribed her discussion with Mr. Poling in her weekly organizer:

> Met [with] DP…Discussed Carrie Johnson – her handicap needs & Michele [Grosklos] said "its [sic] going to be really hard to get all this stuff together." [Mr.

Poling said,] "What's wrong with this girl anyway?" "When you emailed me, you
didn't say we had all this stuff to do. We don't have the time to spend for just one
student and you recommended her, so you need to think about what we're going
to do." I told him we had a legal obligation to provide education for all candidates
applying for education and its [sic] the law, not a choice. I also said that…[t]he
office staff waste a lot of time on personal stuff. This really angered [Mr. Poling.]
He said "this conversation is over – you don't need to do anything. I'll find out
what this girl needs and then make a decision. I said ok but remember Dewayne,
we have to provide education services, its [sic] the law – we cant [sic] discriminate
against her because of a handicap, no matter what it is. I left his
office & he was glaring at me, very angrily.

(*Id.* at ¶ 17, Ex. C).  In another conversation with Ms. Bennett that day, Mr. Poling stated,

"[Y]ou

and I don't agree on this girl."  She replied that it was "not a matter of agreeing, its [sic] the law.

We can't deny her an education." (*Id.*, Ex. C).  In his depositon, Mr. Poling claimed that neither

Plaintiff nor Ms. Bennett ever requested an accommodation in 2008.  (Poling Dep. at 42-44).

On March 4, 2008, Mr. Poling informed Ms. Bennett that he was going to recommend to

the Board of Education that her contract not be renewed, citing financial considerations as the

reason for the non-renewal.  Mr. Poling stated that Ms. Bennett would continue in her position as

Medical Programs Director until the expiration of her contract on June 30, 2008.  Ms. Bennett

attempted to contact Roger Bartunek, Superintendent, on several occasions to ask him to

reconsider Mr. Poling's decision.  Despite leaving several messages, Mr. Bartunek never returned

Ms. Bennett's calls. (Bennett Aff. ¶ 25).

When Plaintiff arrived for class on the evening of March 4, 2008, Lenora Binegar, an

instructor, informed her that the administrative staff needed to speak with her.  (Pl. Aff.

¶ 10).  When Plaintiff reported to the main office, she was given a letter signed by Mr. Poling

dismissing her from the Program, allegedly because Defendant could not apply her prior

educational experience to the Program.  (*Id.*; Ex. 1). The letter instructed Plaintiff to return her books for a refund and suggested that she re-enroll in 2009.  When Plaintiff asked Ms. Cline and Ms. Grosklos why she was being dismissed from the Program, they replied that they did not know.  (Pl. Aff. ¶ 11).  Ms. Becker stated that she did not know why Plaintiff had been dismissed because her tuition had been paid.  Finally, when Plaintiff questioned Ms. Wolfe, Mr. Poling's assistant, about the reason for her dismissal, Ms. Wolfe said that she did not know the reason for Plaintiff's dismissal, and she told Plaintiff to contact Mr. Poling if she had any questions.  Ms. Grosklos grabbed Plaintiff's books from her hands, stating that Mr. Poling had instructed her to take them from Plaintiff.  Confused about why she was being dismissed, and refusing to accept Mr. Poling's decision, Plaintiff emailed Ms. Bennett for clarification on March 5, 2009 and again on March 8, 2008. (Pl. Aff. ¶¶ 11-12, Ex. B; Bennett Aff. ¶¶ 20, 22, Exs. D, E).  Ms. Bennett explained that she did not know why Mr. Poling dismissed Plaintiff and told her to continue attending classes until Ms. Bennett was able to get clarification from Mr. Poling.  (Johnson Aff. ¶12; Ex. B; Bennett Aff., ¶ 20; Ex. D).  Plaintiff continued to attend classes.

On or about March 5, 2008, Ms. Bennett spoke with Mr. Poling about Plaintiff's dismissal.  (Bennett Aff. ¶ 22).  Ms. Bennett again advocated for Plaintiff, stating that Mr. Poling did not have a choice about providing an accommodation.  In response, Mr. Poling stated, "There's always a choice." (*Id.*).  After Ms. Bennett failed to get Mr. Poling to reverse his decision to remove Plaintiff from the Program, Plaintiff appealed Mr. Poling's decision to the Board of Education at its March 11, 2008 meeting.  (Pl. Aff. ¶ 14, Ex. C). The Board reversed Mr. Poling's decision, and Mr. Poling returned Plaintiff's books.  Based on Ms. Bennett's advice, Plaintiff once again asked Ms. Grosklos for an accommodation and submitted information about

the Kurzweil Reader and her textbooks in audio format.  (*Id*. a ¶ 16).

On March 16, 2008, Plaintiff telephoned Ms. Bennett because she was having chest and side pain.  (Pl. Aff. ¶17; Bennett Aff. ¶30).  When Plaintiff expressed concern about missing classes, Ms. Bennett advised Plaintiff to go to the hospital and not to worry about her classes.  (Pl. Aff. ¶17; Bennett Aff. ¶30).  Based on Ms. Bennett's advice, Plaintiff went to the hospital, where she was diagnosed with multiple blood clots in her lungs.  (Pl. Aff. ¶17).  Later that evening, Plaintiff telephoned Ms. Bennett to inform her that she would be in the hospital for at least one week and, upon her discharge, she would have restrictions on her activities, including no climbing steps.  (Pl. Aff. ¶18; Bennett Aff. ¶31).  These restrictions prevented Plaintiff from attending classes the week of March 24, 2008 because her classes were located on upper level floors, which required climbing stairs.  (Pl. Aff. ¶18).  Ms. Bennett informed Mr. Poling of Plaintiff's medical restrictions that prohibited her from climbing stairs and made her classes inaccessible.

In a letter dated March 19, 2008, Ms. Bennett assured Plaintiff that she would contact her instructors about her work assignments.  (Pl. Aff ¶19, Ex. D; Bennett Aff. ¶32, Ex. H).  Ms. Bennett explained that Plaintiff could make up her tests in the next quarter.  (Pl. Aff ¶19, Ex. D; Bennett Aff. ¶32, Ex. H).  Also, Ms. Bennett explained that the accreditation organization was more concerned about the number of surgical cases, rather than in-class attendance.  (Bennett Aff. Ex. H).  Ms. Bennett stated, "We must all realize that if you cannot physically negotiate the stairs and there is no alternate route to your class room, we cannot and will not count you responsible for the absence."  (*Id*.).  Ms. Bennett assured Plaintiff that Defendant "need[ed] to develop an

alternate option for [Plaintiff] to obtain [her] education and hours." (*Id*.). Finally, Ms. Bennett acknowledged that Defendant still had not accommodated Plaintiff by providing her books in audio format or providing her with a Kurzweil Reader as requested. (*Id*.).

On March 21, 2008, Plaintiff left a message for Ms. Bennett stating her concern about returning to school the last week of winter quarter because all of her classes were located on upper level floors, which would have required her to climb steps. (Pl. Aff. ¶21). In a telephone conversation on March 24, 2008, Ms. Bennett reiterated the assurances she made to Plaintiff in the March 19, 2008 letter: Ms. Bennett agreed to get Plaintiff's work assignments and explained that Plaintiff could make up her tests for the first quarter during the second quarter. (*Id*. at ¶22; Bennett Aff. ¶36).

Later on March 24, 2008, Ms. Bennett notified Mr. Poling that Plaintiff had been released from the hospital and asked what WCCC could do to allow her to make up her coursework since she was unable to climb stairs. (Bennett Aff. ¶37, Ex. C). Mr. Poling stated that Plaintiff could not return to classes. When Ms. Bennett argued that Defendant needed to provide an accommodation, Mr. Poling refused, stating that he never wanted to hear about the topic again and, "That tail ain't going to wag this dog." (*Id*. at ¶37, Ex. C). Also on March 24, 2008, Mr. Poling assigned Ms. Bennett's duties to other staff and ordered Ms. Bennett to leave Defendant's premises and not return. (*Id*. at ¶38, Ex. C).

In a telephone message on April 4, 2008, during the week-long break between winter and spring quarters, Plaintiff notified Ms. Bennett that she was still on medical restrictions, informed Ms. Bennett that she was continuing the course work for winter quarter, asked Ms. Bennett for more information on where to turn in assignments and asked Ms. Bennett to have her instructors

7

contact her as soon as possible.  When Ms. Bennett did not return her messages, Plaintiff left messages at the administrative offices for her instructors.  After her instructors did not return her messages, Plaintiff contacted her classmates, whose numbers she obtained during an exchange for a study group, in order to obtain her assignments for spring quarter.  (Pl. Aff. ¶23, Ex. E).

The 2008 spring quarter for the Surgical Technologist Program began on April 7, 2008. Plaintiff did not register for spring quarter classes.  (Bartunek Aff. ¶¶ 22-23).

In a voice mail on, and in a letter dated April 7, 2008, Mr. Poling asked Plaintiff to contact him to schedule a meeting to discuss her options for continuing in the Program.  (Pl. Aff. ¶26, Ex. E).  Mr. Poling's letter also explained that "[Ms.] Bennett's duties at the Washington County Career Center have been changed.  She is no longer acting as the contact for all medical programs.  [He is] in charge and will make all decisions and communications regarding the medical programs for the rest of the school year."  (Pl. Aff. ¶26, Ex. E).  Plaintiff responded via email on April 11, 2008, and again on April 15, 2008.  (Pl. Aff. ¶27, Ex. F).  Plaintiff again requested an accommodation and asked that her instructors contact her so that she could continue with her course of study.  (*Id*. at ¶27, Ex. F).  At this time, Plaintiff was not registered for and had not attended spring quarter classes.  (Bartunek Aff. ¶¶ 29-30).

On April 17, 2008, Mr. Poling, via email, recommended that Plaintiff register for the 2009 Program, beginning in January 2009.  Mr. Poling explained that the "Career Center is a clock hour institution and students have to be in school to get credit for attendance."  (Pl. Aff. Ex. F).[1] Plaintiff did not respond or make any further attempt to contact WCCC.  On April 28, 2008, WCCC refunded Plaintiff's tuition in full.  (Bartunek Aff. ¶¶ 32-34).

---

[1] Plaintiff has construed this email as a dismissal from the Program.

On May 27, 2008, Plaintiff Carrie Johnson filed a Complaint alleging Defendant WCCC violated the Americans with Disabilities Act, 42 U.S.C. 12131, *et seq.*, (Count I) and the Ohio Civil Rights Act, O.R.C. 4112.01 (Count II) when it "finally and completely dismissed her from the Surgical Technologist program." (Compl. ¶ 16).

## II.    STANDARD OF REVIEW

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).[2] The Court disregards all evidence favorable to the moving party that the

---

[2] *Reeves* involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56.

jury would not be not required to believe.  *Id.*  Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses.  *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice.  For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment.  *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  *Id.* (*quoting Liberty Lobby*, 477 U.S. at 257).  The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion.  *Id.*  It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'"  *Id.* (*quoting Matsushita*, 475 U.S. at 586).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish

---

Nonetheless, standards applied to both kinds of motions are substantially the same.  One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, *Reeves*, 530 U.S. at 150.  In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the nonmoving party.  *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

that it is bereft of a genuine issue of material fact." *Id.* at 1479-80.  That is, the nonmoving party

has an affirmative duty to direct the court's attention to those specific portions of the record upon

which it seeks to rely to create a genuine issue of material fact.  *In re Morris*, 260 F.3d 654, 665

(6th Cir. 2001).

## III.    DISCUSSION

Defendant WCCC has moved for summary judgment on Plaintiff's claims.  Defendant

WCCC argues that Plaintiff cannot establish a claim for disability discrimination for two reasons:

(1) she was not "otherwise qualified" to continue in the Program; and (2) she was not dismissed

from the Program.  The Court will address each argument in turn.

## A.    "Otherwise qualified"

The purpose of the ADA is to "provide a clear and comprehensive national mandate for

the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1)

(2005).  To that end, Title II of the ADA mandates that "no qualified individual with a disability

shall, by reason of such disability, be excluded from participation in or be denied the benefits of

the services, programs or activities of a public entity, or be subjected to discrimination by any

such entity."  42 U.S.C. § 12132 (2005).  To establish a *prima facie* case under Title II of the

ADA and/or the Civil Rights Act, a plaintiff must demonstrate that (1) she has a disability; (2) she

is otherwise qualified; and (3) she is being excluded from participation in, being denied the

benefits of, or being subjected to discrimination under the program solely because of his disability.

*Kaltenberger v. Ohio College of Podiatric Medicine*, 162 F.3d 432, 435 (6th Cir. 1998); *Andrews*

*v. State of Ohio*, 104 F.3d 803, 807 (6th Cir. 1997); *Dillery v. City of Sandusky*, 398 F.3d 562,

567 (6th Cir.1995).

Defendant WCCC states that it is willing to assume, for purposes of the Motion for Summary Judgment only, that Plaintiff meets the applicable statutory standards for handicap or disability.  Defendant argues that Plaintiff, however, was not "otherwise qualified" to continue in the WCCC 2008 Program.

Under the ADA, "[a] handicapped or disabled person is 'otherwise qualified' to participate in a program if she can meet its necessary requirements with reasonable accommodation." *Kaltenberger*, *supra* at 435-436, *citing Sandison v. Michigan High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1034 (6th Cir. 1995); *Doherty v. Southern College of Optometry*, 862 F.2d 570, 574-75 (6th Cir. l988).  Under the Ohio Civil Rights Act,

> an 'otherwise qualified' handicapped person is one who is able to safely and substantially perform an educational program's essential requirements with reasonable accommodation.  An accommodation is not reasonable where it requires fundamental alterations in the essential nature of the program or imposes an undue financial or administrative burden.

*Ohio Civil Rights Comm'n v. Case Western Reserve Univ.*, 76 Ohio St. 3d 168 (1996).

However, discrimination laws do not require "an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person." *Southeastern Community College v. Davis*, 442 U.S. 397, 413 (1979).  "While a grantee need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, it may be required to make 'reasonable' ones." *Alexander v. Choate*, 469 U.S. 287, 300 (1985) (*analyzing Davis*, *supra*).  Further, when reviewing the substance of academic decisions, courts "should show great respect for the faculty's professional judgment." *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985).  "University faculties must have the widest range of discretion in making judgments as to the academic performance of students and

12

their entitlement to promotion or graduation." *Id.* at 225 n.11 (*quoting Board of Curators, Univ. of Mo. v. Horowitz* (1978) (Powell, J. Concurring)). Courts must also give deference to professional academic judgments when evaluating the reasonable accommodation requirement. *See McGregor v. Louisiana State Univ. Bd. of Supervisors*, 3 F.3d 850, 859 (5th Cir. 1993); *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 795 (1st Cir. 1992); *Ohio Civil Rights Comm'n*, 76 Ohio St. 3d at 179.

The Ohio Civil Rights Act expressly authorizes educational institutions to establish "bona fide requirements or standards . . . for the granting of grades, certificates, diplomas, or degrees, which requirements or standards may include reasonable qualifications for demonstrating necessary skill, aptitude, physical capability, intelligence, and previous education." O.R.C. § 4112.022(A).

Under both of the aforementioned standards, courts afford considerable deference to the educational institution's substantive decisions regarding its requirements and accommodations. In Ohio, that deference allows courts to circumvent stated academic standards only if "it is shown that the standards serve no purpose other than to deny an education to the handicapped." *Ohio Civil Rights Comm'n*, 76 Ohio St. 3d at 177. Under the ADA, courts "should only reluctantly intervene in academic decisions 'especially regarding degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession.'" *Kaltenberger*, 162 F.3d at 437 (*quoting Doherty*, 862 F.2d at 576).

In this case, Defendant WCCC required, in compliance with the course of study established by the Association of Surgical Technologists for certification as a Surgical

Technologist, that students attend scheduled class hours. (Bartunek Aff. ¶¶3, 5, 13, Exs. A and E). The WCCC Student Handbook sets forth an attendance policy which provides in pertinent part:

> Instructors take attendance at the beginning of each class period. Students leaving early or arriving late will be noted and the times recorded on the attendance sheet by the instructor. It is the student's responsibility to notify the instructor or the Adult Technical Training Office if they will be absent from or late to class. If a student is late for class, the amount of time lost will be based on 15-minute intervals as done in business and industry. Any time lost will be an immediate loss of 15 minutes. Students are expected to remain in class for the entire schedule class. Students with extended illnesses that will require frequent or extended absences should withdraw and re-enter the next school year.

(WCCC Student Handbook at 7).

Even with dispensation for the first seven weeks of missed classes, Plaintiff missed as many of the remaining days of classes in the winter quarter of 2008, as she attended. (Bartunek Aff. ¶ 19, Ex. E). For the entirety of the winter quarter, Plaintiff attended nine days of classes. She ended the quarter missing regular classes on March 17, 18, 19, 24, 25, 26, and 27 and make-up classes on March 20 and 22nd, 2008. The last day Plaintiff attended classes was March 13, 2008. Plaintiff sent an email dated March 27, 2008 to Director Bennett stating:

> On Sunday March 16th, 2008 I made a telephone call to you telling you that I was having check and side pain and I was wondering about school and what I could do if I missed classes. You told me not to worry and go to the hospital. Later that night I phoned you and told you that I was diagnosed with multiple blood clots in my lungs and I will be hospitalized for at least a week. I was directed to be on light movement and I was not to lift, walk a long period of time, and sit for a long period of time, no steps. I left you a message Friday evening stating my concern about returning to school for this week does [sic] to be condition. I received a call from you on Tuesday March 25th, 2008 and we talked about my concerns and what I could do. I am under doctor's orders no steps with this physical handicap and the classrooms not being handicap accessible to me at this time I am asking for my teachers to give me homework that could be used for credit for my grade. We also talked about my finals and you explained the process. I could have an incomplete, and then I could make the test up throughout the 2nd quarter. That would be fine

for me, but my only concern I have with it is if I am off do to my physical handicap longer than the days that I am given to make up the test. Is their a home final or a final test in another form? Or an extensions to the rule of makeup for final. This is do to my physical handicap no way I can make it up to the classroom. I requested for you to talk to my teachers and get my assignment for my classes in our phone communication. I asked if Mr. Poling had advised you if he has received any my books on CD-ROM or tapes yet. You said, he has not notified you that my books have arrived at the school. I would appreciate it if you would notify me as soon as possible when he reserved my books on CD or tape.

Plaintiff argues that Defendant WCCC failed to reasonably accommodate her learning disability and her inability to attend classes due to a physical limitation imposed by her doctor mid-quarter. With respect to Plaintiff's learning disability, she argues that Mr. Poling's conversations with Ms. Bennett on March 4th and 5th provide "strong evidence, if not clear and convincing evidence, that he did not want to provide Plaintiff with an accommodation and believed the search was a waste of time. The evidence shows that after Ms. Grosklos' initial search for Plaintiff's books on tape did not succeed, Mr. Poling decided the easiest course of action would be to dismiss Plaintiff from the Program and recommend non-renewal of Ms. Bennett's contract for persistently reminding him that his actions were unlawful." (Pl.'s Memo. Contra at 13). Plaintiff further asserts that Defendant did not even attempt to accommodate her learning disability by searching for a Kurzweil Reader until five weeks after Plaintiff's enrollment. (Pl.'s Memo. Contra at 13).

There is evidence that WCCC sought to obtain copies of the textbooks used in the Surgical Technologist Program on tape or CD within the first two days of Plaintiff's enrollment in the Program. However, no audio versions of the textbooks were available. One publisher sent a zip file to assist with the visually disabled, but it could not be opened. (Grosklos Aff. ¶¶ 3-6). Plaintiff was then notified that she would not receive credit for her prior education and Ms.

Grosklos's efforts to accommodate Plaintiff ceased. After Plaintiff's reinstatement, WCCC sought to obtain a loaned Kurzweil Reader, but was unable to. Then, WCCC considered purchasing a Kurzweil Reader, but did not do so upon learning that Plaintiff had not registered for Spring Quarter. Further, Plaintiff was not even attending classes at this point.

Defendant WCCC ultimately secured a Kurzweil Reader, however, it was not able to do so within the short time after Plaintiff began classes at the end of February and the quarter ended the end of March. Plaintiff argues that WCCC should have been able to secure one for Plaintiff's use in that short time frame and in fact, has provided evidence that the Washington County Career Center High School, Marietta High School, and the Washington County Joint Vocational School District Board of Education all owned Kurzweil Readers. There is no evidence, however, that these could have been made available for Plaintiff's use. WCCC was attempting to obtain their own, which they eventually did.

In the employment context, the Sixth Circuit has stated that "an employer is permitted a reasonable time to make a 'reasonable accommodation' inquiry under the ADA." *Hoge v. Honda of Am. Mfg.*, 384 F.3d 238 (6th Cir. 2004). It follows that in the educational context, educational institutions should be permitted a reasonable time to make a reasonable accommodation. Defendant WCCC's attempts to accommodate Plaintiff were reasonable considering the fact that Plaintiff was admitted to the program mid-quarter. Further, Plaintiff only attended classes for approximately two weeks and it would not be reasonable to expect WCCC to accommodate Plaintiff within that time period.

Plaintiff argues that her absences do not make her unqualified because she did not delay in requesting her work, and the Student Handbook permitted her to make up the work and absences.

16

Plaintiff asserts that "[t]he evidence establishes Plaintiff took great strides to continue with the program despite not being able to attend classes due to her serious medical condition. It was Mr. Poling's actions that prevented Plaintiff from continuing with the Program." (Pl.'s Memo. Contra at 18). Plaintiff, however, fails to cite to what evidence she is referring. There is the aforementioned email to Ms. Bennett in which she sets forth her case. Plaintiff was permitted to make up the missed work during the next quarter, in addition to the classes she agreed to make-up to remain in the program. However, Plaintiff never registered for the spring quarter, which began on April 7, 2008. Presumably, her condition improved, yet she never showed up at WCCC or attempted to make-up the work or the classes. Plaintiff's last communication with WCCC was on April 15, 2008. She was responding to Mr. Poling's letter of April 7, 2008 to discuss her participation in the Program. Notably, she mentions having her instructors contact her so she doesn't fall behind, yet, it was a week into the spring quarter and she had not even registered, nor shown up to continue the make-up classes and work.

Plaintiff, however, attempts to avoid the issue that she failed to register by arguing that she should have been placed on academic probation in accordance with the Student Handbook. But, if she was not registered as a student, how could she be placed on academic probation? The Court therefore finds that WCCC acted reasonably in attempting to accommodate Plaintiff and most likely would have allowed her to make-up the classes and assignments during the spring quarter because she was already scheduled to make-up the previous classes she missed at the beginning of the quarter. However, no one can know for sure as it was Plaintiff's decision not to register for spring quarter and to cease all communication with WCCC.

**B.      Whether Plaintiff was dismissed from the Program**

Defendant WCCC argues that even if the Court were to find that Plaintiff was "otherwise qualified" for the Program, Plaintiff's claims still fail because she cannot establish that she was dismissed from the Program on the basis of her handicap or disability.[3]

Plaintiff registered and began classes in the 2008 Program on February 27, 2008 and last attended classes on March 13, 2008. She did not take final examinations in any winter quarter class. She acknowledged on March 27, 2008 that this would leave her with an "incomplete" for the quarter and require her to take make-up exams. (Bartunek Aff. ¶¶ 19-21). However, Plaintiff never contacted WCCC to schedule make-up exams. She did not register for spring quarter classes, nor did she pay tuition for spring quarter. Finally, she accepted the refund of all the tuition she paid for winter quarter.

Plaintiff was not discharged, dismissed or excluded from the 2008 Program. She simply stopped attending, paying tuition, registering for classes, taking exams, and otherwise participating in the 2008 Program. As a result of Plaintiff's actions, or lack thereof, Mr. Poling sent her an email dated April 17, 2008, which stated: "The Career Center is a clock hour institution and students have to be in school to get credit for attendance. The best I can recommend is you register for the start of our next program to begin January 2009. I am instructing the treasure [sic] to send you a full refund of monies you have paid and hopefully you will consider us again." In fact, Plaintiff took Mr. Poling's suggestion and registered for the 2009 Program in mid-April 2008.

Plaintiff argues that Mr. Poling's email constitutes a dismissal from the Program. Plaintiff

---

[3] Plaintiff was previously dismissed from the Program in March 2008, based on her lack of prior experience, however, she was reinstated by the Board of WCCC and that dismissal is not currently before the Court.

argues that "Mr. Poling's email made it clear that Plaintiff was not welcome in the Program." (Pl.'s Memo. Contra at 18). Plaintiff further states that it was "Mr. Poling's actions that prevented Plaintiff from continuing with the Program." (*Id.*).

Defendant WCCC argues that Plaintiff's withdrawal from the Program was volitional. Defendant asserts that Plaintiff was not forcibly dismissed, excluded or refused the right to enroll in or attend classes on and after April 7, 2008, and therefore, she cannot establish that she was discharged from the Program due to her disability. Defendant WCCC argues that Plaintiff's requested accommodation in her April 15th email, after the quarter had already begun on April 7th, was not reasonable. WCCC asserts that it had no choice but to return Plaintiff's tuition money because she did not finish the winter quarter and had not registered for the spring quarter.

The Court finds that Plaintiff had effectively withdrawn from the Program, even if not officially. She did not make any reasonable or timely attempts to make-up her classes and work. Her communication via the April 15th email was an unreasonable request for an accommodation considering the winter quarter had ended over two weeks prior to sending that request.

Even assuming that Plaintiff could have made up all of the necessary classes and assignments to receive credit for the winter quarter, there is no dispute that Plaintiff failed to register for the spring quarter. The Program is a year long program and by failing to register, her only option would be to begin the Program again the following January. Therefore, Plaintiff has failed to set forth a claim for violation of the ADA.

The Court is concerned with Ms. Bennett's affidavit testimony regarding her conversations with Mr. Poling. According to Ms. Bennett, Mr. Poling said that Plaintiff could not come back to WCCC. (Bennett Aff. ¶ 37). However, there is no evidence that any such

statement was ever made to Plaintiff.  There is no question that Ms. Bennett did not agree with Mr. Poling's decisions and they did not seem to get along generally.  However, this does not change the fact that Plaintiff stopped all participation in the Program on her own.

Defendant WCCC further argues that there is no evidence that the sole purpose of WCCC's mandatory attendance policy was to deny Plaintiff Johnson and/or other ADA qualified students an education.  (Def.'s Mot. at 9).  Defendant argues and the evidence supports that the clock hour requirement was imposed by the Association of Surgical Technologists, the entity that created the curriculum.  The Court must give deference to WCCC's attendance policy based on the AST curriculum.  *See Case Western*, 76 Ohio St.3d at 177; *Kaltenberger*, 162 F.3d at 437, and *Doherty*, 862 F.2d at 576.  Accordingly, Defendant argues and the Court agrees that Plaintiff Johnson's failure to attend classes, including her make-up classes, rendered her not otherwise qualified for WCCC's 2008 Surgical Technologist Program and she has failed to establish that she was dismissed from the Program because of her disability.

Based on the foregoing discussion, the Court finds that Plaintiff Johnson has failed to present sufficient evidence from which a reasonable jury could find that she was in fact "otherwise qualified" under the ADA and that she was dismissed from the Program based on her disability. Therefore, Plaintiff has not fulfilled her burden of establishing a *prima facie* case of disability discrimination.  Defendant WCCC is entitled to summary judgment in its favor on Plaintiff's federal and state disability discrimination claims.

## IV.    CONCLUSION

Based on the above, the Court **GRANTS** Defendant WCCC's Motion for Summary

Judgment.

The Clerk shall remove Document 18 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

                                                    _/s/ George C. Smith_____
                                                    **GEORGE C. SMITH, JUDGE**
                                                    **UNITED STATES DISTRICT COURT**